199 So. 712

**KNIGHT IRON & METAL CO., Inc. v. ARDIS et al.**

6 Div. 453.

Court of Appeals of Alabama.

May 14, 1940.

Rehearing Denied June 18, 1940.

Reversed on Mandate Jan. 14, 1941.

Thompson & Knight, of Birmingham, for appellant.

Rosenthal & Rosenthal, Erle Pettus, and Beddow, Ray & Jones, all of Birmingham, for appellees.

RICE, Judge.

There are really two appeals here; as there were two separate suits, below. But under a rule of practice in the Jefferson Circuit Court the two cases were combined and tried in that court as one case; and by, we suppose, agreement—at least there is no objection interposed—the two appeals will be treated here as one appeal. But separate judgments were entered below; as there will be, here.

Appellant had a number of laborers to go out "on strike." In other words, due to some undisclosed cause, one day some two dozen or so of its employees failed, or refused, to "show up for work." Through its managing officers it proceeded to replace the employees, who did not report for work, with others; and the operation of the business of the corporation went on with these "substituted laborers"—to call them that.

Feeling ran high. And a crowd, composed of those refusing to go back to their jobs and their sympathizers, or, possibly, merely their sympathizers—variously estimated in size from twenty-five or thirty people, to some eight hundred—gathered about the place of business of appellant; and, as we read the testimony, loitered there throughout the day in a more or less threatening attitude.

When "quitting time" came, on a certain day when the business was being carried on as above, those working in appellant's place of business in the place of those out on strike were afraid to leave the plant. According to the testimony some of them started away and were "run back" by the crowd outside.

The General Manager of appellant had "called the police" just prior to this time— or about this time—to escort these laborers away from the plant.

Some of those working in the plant in the stead of those "out on strike" asked the driver of a truck belonging to another and different concern, but which truck and driver were on appellant's premises at the time —having come there to deliver some articles to appellant—to "carry them out," and "through the crowd." This truck driver did so; being followed out by a car containing the policemen who had come out to appellant's place of business at the call of its General Manager.

Some of the others of these men working in the places of the strikers asked an old employee of appellant's, who was working

there that day, but who was not a foreman, but merely a laborer, and who owned and had present at the plant a Ford car, to "carry them out" and "through the crowd." This request was made in the presence of appellant's General Manager.

This old employee—Holmes by name—testified at the trial, and he said that when these laborers asked him to "take them out" he asked the General Manager if "he had a pistol there." And that the General Manager replied: "Well there was (is) one over on the desk." And Holmes testified that he got the pistol from the place indicated by the General Manager, and took it with him as he drove out with the laborers on board. A car containing policemen, as above herein mentioned, followed Holmes' car on its first trip—he made two —as it made its way, loaded with the laborers referred to, out through the crowd surrounding appellant's plant.

Either going through the crowd, on his way out from appellant's plant, or coming back through it, on his way back to the plant, Holmes, who said he was frightened, fired the pistol, procured as above, two or three times—toward the ground, as he said—in order, as he testified, to "scare" the people composing the crowd.

Bullets from two of said shots struck the plaintiffs in these suits. And the undisputed testimony shows that neither of them was connected in any way with the "strike" in progress at appellant's plant; but that both of them were going about their own private concerns on a public street where they had a perfect right to be,—John Ardis on his way home from work in another locality; and the little girl, Luvenie Smith, at play with some other children.

The testimony shows that Holmes, after returning to appellant's plant from his *second* trip carrying these laborers as above—all the while having available the pistol procured as we have described—was "taking a bath" at the plant—as was his custom—and "changing his clothes," when the police officers came and arrested him.

And plaintiffs' testimony was that when the policemen came to arrest Holmes, to put it in the words of officer Phillips who testified: "We took him into the office (of appellant) and Mr. Knight (appellant's General Manager) gave us the pistol that Mr. Holmes had shot the people with. He got it out of one of the drawers in the desk there." And, further (Question to officer Phillips) "And did you hear Mr. Knight,

the Manager of the plant, tell Mr. Holmes what he was going to do?" Answer: "Mr. Knight said he would take care of things" —"Yes, that was in reply to Mr. Holmes telling him that he had gotten in trouble by shooting these people; that Mr. Knight told him he would take care of it."

Of course it should be noted that appellant's General Manager testified that he *told* Holmes, when Holmes agreed to, and did, "carry out" the laborers, above—at least "two loads" of them—that (when Holmes asked him about "taking the men to town"—as he phrased it) "If you do, it will be at your own risk, because I am not going to instruct you to take anybody away from the plant." And there may be a denial of some part of what we have narrated above as "being shown by the testimony;" at least, though, the testimony on behalf of *appellees* tends to show as we have outlined. And that, for the purpose we have in mind, is sufficient.

In the John Ardis case—and both it and the Luvenie Smith case are suits for damages for an assault and battery committed by a servant or agent of appellant while acting within the line and scope of his employment—the pleas were the general issue and two pleas denominated "self-defense."

In the Luvenie Smith case the plea was simply the general issue.

As for the "self-defense" aspect of the John Ardis case nothing need be said. Whatever the status with reference to the sufficiency vel non of the pleas of "self-defense," this issue was submitted to the jury and found against appellant—as is well nigh in accord with the undisputed testimony.

Appellant's counsel have filed here a rather elaborate brief; but not in accord with the rules which prevail. And a careful study of their brief persuades us that but a single question is argued to us in a way to call for our decision. And that is: Whether or not the duly requested general affirmative charges should have been given in appellant's favor as for a total failure of the testimony to show that Holmes, who admittedly fired the shots which caused the injuries to each of the plaintiffs, was at the time acting within the line and scope of his employment as appellant's agent.

There is one question raised, and probably presented, arising out of an exception reserved on the taking of testimony, which perhaps we should notice. At any rate we

will do so—and that before proceeding to the main question, above.

■ Appellant sought to ask the witness Holmes, on cross-examination, this question: "State whether or not you took these people on your own responsibility?" Appellees' objection was sustained; and an exception reserved.

We think the ruling of the court was without error. It seems to us, and we hold, that the language of our Supreme Court in its opinion in the case of Birmingham R. L. & P. Co. v. Humphries, 172 Ala. 495, 55 So. 307, 309, is decisive of the question. Said language is, in sufficient part, as follows, to-wit: "Facts were already before the jury, from which it was for them to decide whether or not the services were rendered to the plaintiff * * * and we hold * * * witness should not have been allowed to testify as to his motive, purpose, or intention in rendering the services. * * * The testimony admitted in the case of Emerson v. Lowe Mfg. Co., 159 Ala. 350, 49 So. 69 [a case cited to us by appellant's counsel, here, we interpolate], did not involve the mere intention * * * but the fact whether or not the act was *within the duties of his official position.*" And see Arnold v. Cofer et al., 135 Ala. 364, 33 So. 539.

■ And now we come to the main question (stated above)—we were about to say the *only* question—presented for our consideration on the two appeals. And we will begin our discussion by a simple quotation of a few principles of law which, we feel, govern the decision of the question, namely:

1. "Unless otherwise agreed (and it was not, here), authority to manage a business includes authority to make contracts which are incidental to such business * * * *or are reasonably necessary in conducting it.*" (Italics ours.) 1 American Law Institute's Restatement of the Law of Agency, § 73, p. 173.

2. "Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." 1 Restatement of Law of Agency, supra, § 1, p. 7.

3. "The relationship of agency is created as the result of conduct by the parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on his behalf and subject to his control.

"It is not necessary that the parties intend to create the legal relationship or to subject themselves to the liabilities which the law imposes upon them as a result of it." 1 Restatement of Law of Agency, supra, § 1, p. 8.

4. "While agency may not be proved by the *declarations* of the agent, it may unquestionably be established by the *testimony* of the agent; and such testimony may involve only a statement of the fact of agency without going into the details as to how the relation was brought about, or as to the particular facts upon which it rests." Parker v. Bond, 121 Ala. 529, 25 So. 898, 902. And see Rogers v. Smith, 184 Ala. 506, 63 So. 530.

5. "If the fact of agency rests in parol, or it is to be inferred from the conduct of the principal, and there be evidence tending to show the agency, the acts or declarations of the agent are admissible in evidence, and the jury must determine the fact of agency vel non." Roberts & Sons v. Williams et al., 198 Ala. 290, 73 So. 502, 503.

■■ Applying the law, quoted, to the facts as the testimony shows them—or tends to show them—we are persuaded and hold, that there were questions presented, upon which the liability of appellant for Holmes' act in negligently shooting each of the appellees depended, which questions should have been, as they were, submitted to the jury for its decision.

Ordinarily, it is true, an employer (as appellant, here) is not liable for the tort of an employee (as Holmes) after he has left the premises, where the employee is merely seeking to further his own interests in getting home or back to the premises.

In this case (or these cases) there are points which distinguish it (them).

First, we think we can assume that the employer is interested in getting the temporary employees home. The situation, it is true, has been created without his fault—so far as appears—but we may suppose that it might be found to be within the general scope of the general manager's employment to get the employees home safely, as it would be if there were a flood or other circumstances which endangered the em-

604

ployees or which would prevent them from reaching their homes. Under these conditions the Manager would, clearly, be authorized to employ means of conveyance for the employees, and supply them with a driver, in order to keep the business running. This, while it may have not been done directly, could be inferred by the jury from the fact that they were authorized to find that the General Manager loaned the pistol to Holmes.

If this, in the jury's estimation, was done to aid the employer's business, they were authorized to find that the driving by Holmes was in the scope of his employment.

Once the jury found—as was its province—that Holmes was acting as appellant's servant in driving the laborers away from its plant in his car, the appellant would be liable for the damages carelessly—and the undisputed testimony shows that he "shot at nothing in particular"—just "shot toward the ground"—inflicted upon appellees. This for the reason that the use of the pistol under the circumstances was expectable.

It clearly appearing that Holmes did not shoot either of appellees through any personal ill will; in fact that he did not shoot either of them intentionally, at all, but shot merely, as he thought, to aid him in discharging the mission he was on, we sum up as follows: The jury might rightfully infer that Holmes was the servant of appellant in driving the laborers away from appellant's plant in his car, because, (a) it was so understood between him and the General Manager; and (b) it was within the scope of the General Manager's duties so to employ him; and (c) the General Manager acted for the Master's (appellant's) interests in doing so; and (d) the General Manager lent the pistol (or so the jury could infer from the testimony) as a means of accomplishing the objects of the Master (appellant).

We therefore conclude that there was no error in refusing to give to the jury at appellant's request the general affirmative charge to find in its favor in either of the cases.

And the judgments are affirmed.

Affirmed.

PER CURIAM.

Reversed and remanded under provisions of Code 1923, § 7318.